UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CHERYL OLSON,<br><br>                        Plaintiff,<br><br>    v.<br><br>AARP INC., AARP FOUNDATION,<br>and SANDRA MOORE,<br><br>                      Defendants. | NO: 2:17-CV-0426-TOR<br><br>ORDER ON CROSS-MOTIONS FOR<br>SUMMARY JUDGMENT |

BEFORE THE COURT are Defendants AARP, Inc., AARP Foundation, and Sandra Moore's Motion for Summary Judgment (ECF No. 32) and Plaintiff Cheryl Olson's Motion for Partial Summary Judgment (ECF No. 66). The motions were heard with oral argument on April 18, 2019. The Court has reviewed the briefing and the record and files herein, considered the arguments of counsel and is fully informed. For the reasons discussed below, Defendants' Motion is granted in part and Plaintiff's Motion is granted in part.

The Defendants contend AARP, Inc. is not a proper Defendant and Plaintiff agrees.  The Court will dismiss AARP, Inc.

## BACKGROUND & FACTS

This case concerns alleged discrimination by Defendants for requiring Plaintiff Cheryl Olson to hold onto the leash of her service dog when participating in the Senior Community Service Employment Program (SCSEP).  The relevant and material facts for which there is no genuine dispute are set forth below, unless otherwise noted.

1. **The Senior Community Service Employment Program**

Congress authorized the Secretary of Labor to "establish an older American community service employment program" in order "[t]o foster individual economic self-sufficiency and promote useful opportunities in community service activities (which shall include community service employment) for unemployed low-income persons who are age 55 or older, particularly persons who have poor employment prospects, and to increase the number of persons who may enjoy the benefits of unsubsidized employment in both the public and private sectors . . . ." 42 U.S.C. § 3056(a)(1).  Congress authorized "the Secretary [to] make grants to public and nonprofit private agencies and organizations, agencies of a State, and tribal organizations to carry out the program[.]"  42 U.S.C. § 3056(b)(1).  Grantees receive "financial assistance directly from the Department to carry out SCSEP

activities." 20 C.F.R. § 641.140. Grantees then provide training and match

SCSEP participants with "host agencies" (a public agency or a private 501(c)(3)

nonprofit organization) "which provide[] a training work site and supervision for

one or more participants." 20 C.F.R. § 641.140. The grantees then provide

payment (using grant funds) to the participants for time the participants spend in

training with the grantee and the host agencies.

2. **AARP Foundation**

AARP Foundation is a grantee of SCSEP and has an office in Spokane,

Washington. ECF No. 33 at 1-2, ¶ 1. Defendant Sandra Moore is the Program

Director for SCSEP at the AARP Foundation offices in Spokane, Washington.

ECF No. 33 at 1, ¶ 3. Ms. Moore has held this position since November 7, 2015.

ECF No. 34 at 1, ¶ 2.

Participants accepted into the program meet at the AARP Foundation offices

(1) twice a month for one-hour for "Individual Employment Plan" (IEP) meetings,

and (2) to attend "job club" meetings. ECF No. 33 at 2, ¶ 6. At the IEP meetings,

participants meet with a "volunteer employment specialists" (*a.k.a.*, a "job coach")

to discuss job placements and "employment related topics such as writing cover

letters, and making 'cold calls.'" ECF No. 68 at 7-8, ¶ 26. "At job club meetings,

a group of SCSEP participants [] discuss issues and experience from their job

placements and an AARP Foundation job coach (and other participants) []

comment[s] and provide[s] counseling, advice, and encouragement about how to

be effective employees." ECF No. 68 at 8, ¶ 27. AARP Foundation also places

the participants "with community non-profit or public host agencies on a

temporary basis in order to help prepare the participant to gain experience to rejoin

the workforce." ECF No. 33 at 2, ¶ 7. "The AARP Foundation is then required to

provide grant money (while withholding federal income tax, social security, and

Medicare from their paycheck, ECF No. 73 at 2) to the participant to subsidize

their time spent at job counseling meetings, orientation, training, and at the local

community service assignment." ECF No. 33 at 2, ¶ 8 (citing 20 C.F.R. §§

641.535(a)(9), 641.540(f), 641.565(a)).

   3. **Ms. Olson Participates in SCSEP at AARP Foundation**

        Plaintiff Cheryl Olson enrolled in the SCSEP program in February 2015.

ECF No. 33 at 3, ¶ 9. According to Defendants, "Ms. Olson received a participant

acknowledgment or agreement on the SCSEP requirements, when she began the

program" and "Ms. Olson read and signed the acknowledgment," which says:

> (3) SCSEP is a short-term, work-training program usually lasting
> months, not years, which helps to prepare participants for
> unsubsidized employment. SCSEP participants are considered to be
> in temporary, training status, preparing to accept unsubsidized
> employment off of the program. The program is not an entitlement,
> nor is it designed to provide income maintenance. I acknowledge that
> the training with the Host Agency is NOT a job and if I am enrolled *I
> am not an employee of either the AARP Foundation or the Host
> agency to which I am assigned*.

ECF No. 33 at 3 (emphasis added by Defendants).

Plaintiff is in her late 60s and suffers from degenerative disc disease, osteoarthritis, and migraine headaches. ECF No. 68 at 1-3, ¶¶ 2, 4-7. Plaintiff uses a service dog, Boomer (a German shorthaired pointer weighing approximately 65 to 70 pounds), for help with her disabilities. ECF No. 68 at 4, ¶¶ 10-11. According to Plaintiff, Boomer (1) assists Plaintiff with her mobility issues (balancing, shifting positions, squatting, getting up and down) by using Boomer's harness as an anchor and (2) detects pending migraines and whether Plaintiff is "experiencing pain, high stress, and when [Plaintiff feels] sick." ECF No. 68 at 4-6, ¶¶ 12-15, 19-20.

While in the program, Plaintiff "applied for jobs through the program[,] . . . attended monthly meetings with a SCSEP work specialist[,]" and "received computer training at Spokane Community College, which AARP Foundation funded." ECF No. 33 at 3, ¶¶ 10-12. Ms. Olson received checks through AARP Foundation's Grants Payroll Account. *See* ECF No. 33 at 3, ¶ 13.

When Plaintiff first entered the SCSEP at AARP Foundation, Plaintiff brought Boomer with her. ECF No. 68 at 7, ¶ 26. Plaintiff recalls telling her initial job coach, "Ardyes" of her need to use Boomer:

> Upon enrolling in SCSEP, [Plaintiff] informed [her] job coach, "Ardyes," of [Plaintiff's] disabilities (degenerative disc disease, osteoarthritis, migraines), and the fact that [Plaintiff] relied upon a

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 5

service dog [and] ensured that it was okay that I brought Boomer to AARP Foundation's Spokane office [] and to my job placements.

ECF No. 68 at 7, ¶ 25. "Between February 2015 and November 2015," Plaintiff brought Boomer and "worked Boomer off-leash"; during this timeframe, Plaintiff does not recall "any issues concerning, or complaints about, Boomer." ECF No. 68 at 9, ¶ 30.

### 4. **Complaints about Boomer**

Sometime in December of 2015 or January of 2016, Ms. Moore "became concerned over Ms. Olson having Boomer off leash in the offices" after "Tracy Miller, a site participant (and later a job coach) who walks with a cane, approached Ms. Moore and complained that Boomer was lying in the middle of the floor."[1] ECF No. 34 at 2, ¶ 7. At her deposition, Ms. Moore testified that Tracy Miller "asked if there was any way that we could have [Plaintiff] put [Boomer] on a leash because she had almost tripped over [Boomer] because of where he was laying in

---

[1]   According to Plaintiff, "Miller clarified that Boomer might not have been lying in the 'middle of the floor.' She saw Boomer lying in the entry way of the AARP Foundation office while Olson was sitting in a chair, also in the entry way." ECF No. 73 at 3-4.

the middle of the floor, and she didn't want the dog or herself to get hurt." ECF

No. 78-1 at 36. According to Ms. Moore, at this time "Diane Smith [the front desk

receptionist], who also is a little unsteady on her feet and has arthritis, had [also]

mentioned that Boomer did roam in the office on a regular basis." ECF No. 78-1

at 37, 40.

According to Ms. Moore, up until this point in time, Ms. Moore (1) did not

have any problem with Plaintiff bringing Boomer (including off-leash) and (2) was

not even aware that Boomer was a service dog for Ms. Olson because Boomer was

never identified as a service dog (Ms. Moore testified that she never saw Boomer

with anything designating him as a service animal until November of 2018, after

the suit was filed). ECF No. 78-1 at 37. At a staff meeting without Ms. Olson

present, Ms. Moore "asked why [Plaintiff] had a dog because [Boomer] wasn't

identified as a service dog" and "three people in the staff meeting [] said she gets

migraine headaches." ECF No. 78-1 at 35. Ms. Moore responded by saying that

she "believe[s] [she] can request [Boomer] be on a leash, because [she] knew the

ADA law stated as long as it didn't interfere with the dog's job or the handler's

ability to hang onto a leash." *Id*. Ms. Moore explained that, in her "mind [she]

couldn't figure out why it would interfere with the dog doing his job if he was

there to tell her she was getting a migraine. And so that's where it went." *Id*. Ms.

Moore testified that she "never heard anything different as far as why she couldn't

do it until [the day before her deposition during litigation]." *Id.*

5. **Alleged Discrimination / Failure to Accommodate**

At Ms. Moore's direction, "[o]n or about March 2, 2016, [Plaintiff] received a call from [her] job coach, Tori Hunter, who told [Plaintiff] that [she] would have to start putting Boomer on a leash in the Office." ECF No. 68 at 9, ¶ 31. "A couple days later, on or about March 4, 2016, [Plaintiff] met with Hunter [for Plaintiff's] annual renewal in the [SCSEP] program" where Plaintiff "explained [her] disabilities to Hunter, the fact that [Plaintiff] relied on Boomer, and that [Plaintiff] could not physically hold onto Boomer's harness or short leash." ECF No. 68 at 9, ¶ 32. When Plaintiff was "talking to Hunter, Sandra Moore saw that [Plaintiff] was not holding onto Boomer's leash and loudly ordered [Plaintiff] to hold the leash to keep 'her people' from injury." ECF No. 68 at 9, ¶ 33. Plaintiff then "told Ms. Moore that Boomer was a service dog, under [her] control, and that [Boomer] was an accommodation for [her] disabilities" but still "reluctantly held Boomer's short leash for 40-50 minutes until [Plaintiff's] renewal meeting with Hunter was over." ECF No. 68 at 10, ¶ 34-35. According to Plaintiff, "[h]olding onto the leash in this position caused [] three days of physical pain, a migraine, and affected [Plaintiff's] ability to walk, shower and cook." ECF No. 68 at 10, ¶ 35.

In a letter to Plaintiff dated April 1, 2016, Ms. Moore clarified her position regarding the leash policy and the basis for her opinion, stating:

Per your conversation with your Employment Specialist Tori Hunter on your rights as an owner of a service animal, I would like to make my decision clear. Under the ADA, "service animals must be harnessed, leashed, or tethered, unless the devices interfere with the service animals' work or the individual's disability prevents using these devices." Being within my rights according to the ADA requirements, I have also asked you to maintain control of Boomer for the safety of other participants in our office who may not be sturdy on their feet or may not see a "wandering" animal. This is a small crowded office and there is not enough free space to allow this to continue to happen. I respect your need to have a service animal however there are responsibilities that come with that right.

If you have any questions do not hesitate to contact me directly or you may also refer to www.ada.gov/service_animals.

ECF No. 68-4. Plaintiff received the letter on April 4, 2016. According to Plaintiff, "[u]pon receiving this letter [she] became overwhelmed with stress, anxiety, and experienced nausea and vomiting." ECF No 68 at 10, ¶ 36. In turn, Plaintiff sent an e-mail to Ms. Hunter with "a copy of RCW 9.91.170, concerning service dogs." ECF Nos. 68 at 10, ¶ 37; 68-5.

Plaintiff "was scheduled to attend a job club meeting at the Office on or about April 6, 2016[,]" but "[g]iven Moore's treatment [of Plaintiff], [Plaintiff] did not feel comfortable returning to the Office[,]" Plaintiff sent an e-mail to "Hunter requesting that that [her] next IEP meeting take place over the phone." ECF No. 68 at 10, ¶ 38. Plaintiff did not explain the reason for her request in the e-mail. *See* ECF No. 68-6. Ms. Hunter declined the request, citing the rule "that phone

IEP meetings were only allowed for participants who live outside Spokane County[.]" ECF No. 68 at 10, ¶ 38.

On April 28, 2016, Ms. Hunter sent an e-mail to Plaintiff to confirm the IEP appointment set for April 29, 2016. In the e-mail, Ms. Hunter reminded Plaintiff: "If you bring Boomer he does have to be on a leash!" ECF No. 68-7.

Plaintiff "attended a job club meeting at the Office on or about May 4, 2016." At the meeting, Plaintiff "commanded Boomer to rest under the table and waited for the meeting to begin." ECF No. 68 at 11, ¶ 40. Plaintiff was not holding Boomer's leash. *Id*. According to Plaintiff: "Within ten minutes, [Plaintiff] was approached by Moore, who slammed some papers on the table in front of [Plaintiff]. The papers turned out to be printouts of the ADA law/DOJ regulations with some portions underlined ("leashed" and "tethered")." ECF No. 68 at 11, ¶ 41. According to Plaintiff, "[a]fter Moore left, [Plaintiff] told Karen Johnson, the Office's Assistant Project Director, that I had degenerative disc disease and arthritis, which prevented me from holding Boomer's leash at all times." ECF No. 68 at 11, ¶ 42. "Johnson then asked [Plaintiff] to leave, saying that [Plaintiff] would be paid for the meeting time, and that [Plaintiff] was welcome to file a complaint with the Human Rights Commission." ECF No. 68 at 11, ¶ 43.

//

After the May 2016 job club meeting, Ms. Johnson reported to Ms. Moore that Ms. Olson said she had degenerative discs and rheumatoid arthritis, she had something wrong with her hands. ECF No. 69-4 at 29-30, 69 (Ms. Moore's deposition). Ms. Moore never asked Ms. Olson whether her disability prevented her from holding onto Boomer's leash. *Id.* at 34.

On May 9, 2016, Ms. Hunter e-mailed Plaintiff asking her to call so they can reschedule Plaintiff's IEP. *See* ECF No. 68-8. The same day, Plaintiff emailed Ms. Hunter back, responding: "Because of what happened [in] job club last week and I'm always going to work Boomer off leash[,] how do you think we should do this[?]." ECF No. 68 at 11-12, ¶ 44. Ms. Hunter responded to Ms. Olson in a May 11, 2016 e-mail, stating:

> Hi Cher, I talked to Karen and Sandy and they said that if you are unwilling to put Boomer on a leash, it violates the safety rules for this office which could lead to possibly exiting you from our program. If you want to discuss this further please call and talk to Karen (not me) at 509- 325-7712. Thanks.

*See* ECF No. 68-9.

According to Plaintiff, she contacted Tracy Miller and asked if she could conduct the next IEP meeting by phone. Plaintiff states that she "made this request because [she] was out of town, but also because [she] did not want to return to the Office on account of the discrimination [she] experienced there." ECF No. 68 at 12, ¶ 46. Plaintiff does not claim to have actually told Tracy Miller the basis for

her request. "Miller did not permit [Plaintiff] to participate by telephone, and she

rescheduled [Plaintiff's] IEP meeting for June 9, 2016. *Id*.

"On June 9, 2016, [Plaintiff] attended an IEP meeting at the Office and saw

a sign posted on the front door that read: "DOGS MUST BE ON A LEASH AT

ALL TIMES WHILE IN THIS OFFICE. Thank you for your cooperation". ECF

No. 68 at 12, ¶ 47; *see* ECF No. 68-10. Plaintiff attended the IEP meeting and held

onto Boomer's leash, which "was extremely painful" and caused Plaintiff to be

"bedridden for the weekend following the interview." ECF No. 68 at 12, ¶ 48.

On July 22, 2016, Plaintiff met her job coach (Tracy Miller) at the office.

ECF No. 68 at 13, ¶ 49. Plaintiff "had to drop the leash briefly to put my keys into

my purse" when "Denise Ward, a receptionist, immediately demanded that

Plaintiff[] hold the leash." *Id*. Before Plaintiff left the office, Plaintiff "was

summoned to Assistant Director Karen Johnson's office[,]" who told Plaintiff she

"was being unreasonable by not complying with the current office policy of

keeping Boomer on a leash." ECF No. 68 at 13, ¶ 50. Plaintiff told Johnson that

she "was in compliance with the ADA protocol regarding service dogs and

training." *Id*. However, "Johnson told [Plaintiff] that she was giving [her] a

sanction (pursuant to AARP policy) for being unreasonable." *Id*.

Over the following months, Johnson and/or a receptionist would follow

Plaintiff around at the office to make sure Boomer remained on his leash. ECF No.

68 at 14, ¶¶ 54-58. In response, Plaintiff either left Boomer home or held him on the leash in the office. *Id*. Plaintiff took medical leave from the program in January 2017 and withdrew in March 2017. ECF No. 68 at 15, ¶¶ 59-60. Plaintiff explains that she "could no longer work at the Office due [to] my fear of Moore's and Johnson's repeated verbal attacks and threatening behavior, as well as the action of AARP Foundation's staff, and AARP's policy requiring that I hold Boomer's leash at all times." ECF No. 68 at 15, ¶ 60.

6. **Procedural history**

Plaintiff filed suit on November 17, 2017 in the Spokane County Superior Court. ECF No. 1-1 at 4. In the Complaint, Plaintiff asserts Defendants are liable for the tort of intentional or negligent infliction of emotional distress, ECF No. 1-1 at 13, and for discrimination under the Washington Law Against Discrimination (WLAD) and the American's With Disabilities Act (ADA), ECF No. 1-1 at 12. Defendants removed the action to this Court on December 20, 2017. ECF No. 1.

After securing new counsel, Plaintiff filed an Amended Complaint (ECF No. 55) dropping the claim for negligent infliction of emotional distress, separating the ADA claims into a claim under Title I and under Title III, and adding a claim under the Rehabilitation Act. ECF No. 55 at 17.

Defendants now seek summary judgment on all of Plaintiffs claims. ECF Nos. 32, 77. Plaintiff seeks partial summary judgment on her claims, contending that causation and damages are all that remain for trial. ECF Nos. 66, 87 at 1.

## STANDARD OF REVIEW

A movant is entitled to summary judgment if "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" where the evidence is such that a reasonable jury could find in favor of the non-moving party. *Id.* The moving party bears the "burden of establishing the nonexistence of a 'genuine issue.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." *Id.*

Only admissible evidence may be considered. *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002). As such, the nonmoving party may not defeat a properly supported motion with mere allegations or denials in the pleadings. *Liberty Lobby*, 477 U.S. at 248. The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's]

favor." *Id.* at 255. However, the "mere existence of a scintilla of evidence" will not defeat summary judgment. *Id*. at 252.

## DISCUSSION

### A. **Intentional Infliction of Emotional Distress**

Defendants request summary judgment on Plaintiff's claim for intentional infliction of emotional distress (IIED), arguing the complained of conduct does not establish an IIED claim as a matter of law. Plaintiff argues her IIED claim should survive because "Defendants engaged in an almost year-long course of discriminatory conduct against [Plaintiff and her service animal], insisting that she hold [the service animal's] leash when [Plaintiff's] disability prevented her from doing so and when the leash interfered with [the service animal's] tasks." ECF No. 72 at 12. Plaintiff concedes that this conduct might not rise to the level of "outrageous" in some cases, but argues this case is different because Defendants were in a position of authority; Plaintiff was particularly susceptible to discrimination; and Defendants controlled her schedule and could "sanction" Plaintiff for noncompliance. ECF No. 72 at 13. The Court agrees with Defendants.

"The tort of outrage requires the proof of three elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress." *Kloepfel v. Bokor,* 149

Wash.2d 192, 195 (2003); *Lyons v. U.S. Bank Nat. Ass'n*, 181 Wash.2d 775, 792 (2014). As explained by the Washington Supreme Court, "any claim for intentional infliction of emotional distress must be predicated on behavior '*so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.*'" *Kloepfel*, 149 Wash. 2d at 196 (internal quotation marks omitted; emphasis in original) (quoting *Grimsby v. Samson*, 85 Wash.2d 52, 59 (1975) (quoting *Restatement (Second) of Torts* § 46 cmt. d)). "Consequently, the tort of outrage 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' In this area plaintiffs must necessarily be hardened to a certain degree of rough language, unkindness and lack of consideration." *Id.* (internal quotation marks omitted) (quoting *Grimsby,* 85 Wash.2d at 59 (quoting *Restatement (Second) of Torts* § 46 cmt. d)).

While the Court recognizes Defendants actions caused Plaintiff distress, the complained of conduct does not rise to the level necessary to support a claim of intentional infliction of emotional distress. Requiring Plaintiff to hold onto Boomer's leash may have caused her physical pain and Defendants may have been overly-diligent and rude in how they attempted to maintain compliance, but the Defendants' actions do not "go beyond all possible bounds of decency" and the conduct cannot rightly be called "atrocious". Defendants are entitled to summary

judgment on this claim.

B. **Title I of the ADA does not apply**

Plaintiff asserts a claim under Title I of the ADA. Title I prohibits discrimination in the work-place by an employer. Plaintiff argues she is entitled to relief under Title I as an "employee" of AARP Foundation. Defendants argue AARP Foundation is not her employer. The Court finds that Title I does not apply because AARP Foundation is not Plaintiff's employer. *See Daniels v. Browner*, 63 F.3d 906 (9th Cir. 1995) (finding similar program did not establish an employer relationship sufficient to trigger waiver of sovereign immunity because Congress "was clear that [the] participants are not federal 'employees' . . . .").

As with all legislative causes of action, the Court must first attempt to discern the intent of Congress. The Court finds that Congress did not intend to apply Title I liability in the SCSEP program. First, Congress expressly limited the reach of Title I to employees. 42 U.S.C. § 12112; *see Tennessee v. Lane*, 541 U.S. 509, 536 (2004). Second, the plain language of the legislation authorizing the SCSEP program suggests there is no employer-employee relationship because (1) the legislation authorizes the provision of "supportive services" to participants like Plaintiff and (2) the provision of services to an individual is much different than hiring an individual to provide services to others. 42 U.S.C. § 3026. Third, the

legislative history demonstrates Congress did not intend to create such a relationship.  As the Senate Appropriations Committee Report states:

> The Committee reaffirms that participants in the Senior Community Service Employment Program are enrollees in a work experience program.  They are not employees of the U.S. Department of Labor or State and national sponsors administering the Senior Community Service Employment Program.

S.Rep. No. 102-397 at 15 (1992) (cited in *Henderson v. YMCA*, No. 05-3179, 2006 WL 752792 *2 (C.D. Ill. March 21, 2006).

Even if the Court were to look further, the Court could not find an employee-employer relationship exists.  Unless a federal "statute otherwise dictates," courts apply the common law definition of employee.  *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23 (1992).

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished.  Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992) (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989)).  The Court finds

AARP Foundation is not Plaintiff's employer. Critically, Plaintiff does not perform any work for AARP Foundation. As such, Plaintiff is not working for the benefit of AARP—AARP is working for the benefit of Plaintiff. That is, it is AARP Foundation that is providing a service to Plaintiff—training and pass-through grant money. As such, AARP Foundation has no real control over Plaintiff other than requiring she attend monthly meetings to stay in the program. Any other factors that may weigh in favor of finding otherwise do not overcome the fact that Plaintiff does not perform any work for AARP Foundation.

For these reasons, the Court finds Plaintiff does not have a claim under Title I of the ADA. Other courts have reached this conclusion under similar reasoning, *see Henderson v. YMCA*, No. 05-3179, 2006 WL 752792; *Molina-Olivo v. Experience Works, Inc.*, No. 09-1331, 2009 WL 1767552 (D. P.R. June 17, 2009), and Plaintiff has not cited any law to the contrary, *see* ECF Nos. 72 at 3-4; 66 at 30-31.

C. **Title III of the ADA; Rehabilitation Act; WLAD**

Because the AARP Foundation office fits under the "social service center establishment" category for places of public accommodation, *see* 42 U.S.C. § 12181(7)(K), and because the AARP Foundation receives federal financial assistance in running the SCSEP, Plaintiff's claims of discrimination implicate the protections provided under Title III of the ADA, Section 504 of the Rehabilitation

Act, and the WLAD.  *See Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128 (2005) ("Title III of the ADA prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations[.]"  (citing 42 U.S.C. § 12182(a)); 29 U.S.C. § 794(a) (Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); *Washington State Commc'n Access Project v. Regal Cinemas, Inc.*, 173 Wash. App. 174, 186–87 (2013) ("The WLAD bans discrimination because of 'the presence of any sensory*,* mental, or physical disability[,] which includes the right 'to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement.'" (emphasis removed; quoting RCW 49.60.030)).

Under Title III, "[e]ntities that provide public accommodations . . .  must make 'reasonable modifications in polices, practices, or procedures, when such modifications are necessary' to provide disabled individuals full and equal enjoyment . . ."  *Spector*, 545 U.S. at 128 (quoting 42 U.S.C. § 12182(b)(2)(A)(ii)). The same is true under the Rehabilitation Act.  *See Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 884 (9th Cir. 2004) ("The standards used to determine

whether an act of discrimination violated the Rehabilitation Act are the same standards applied under the Americans with Disabilities Act").  The WLAD also requires places of public accommodation to provide the same services to the disabled or otherwise provide a *reasonable accommodation* where provision of the "same service will defeat the purposes of the law against discrimination."  Wash. Admin. Code §162-26-060; *Regal Cinemas, Inc.*, 173 Wash. App. at 187. "Washington courts may look to Title III of the Americans with Disabilities Act (ADA) and interpretation of that provision as one source of guidance in adjudicating WLAD cases."  *Id.*  "That source of law is helpful, though it is not necessarily dispositive."  *Id.*

Under Title III, "[p]olicies, practices, and procedures need not be modified . . . if doing so would 'fundamentally alter' the services or accommodations being offered."  *Spector*, 545 U.S. at 129 (quoting 42 U.S.C. §§ 12182(b)(2)(A)(ii)-(iii)). "Additionally, Title III does not impose nondiscrimination or accommodation requirements if, as a result, disabled individuals would pose 'a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services[.]'"  *Id.* (quoting 42 U.S.C. § 12182(b)(3)).  Under the WLAD, entities need only provide accommodations "reasonably possible in the circumstances", Wash. Admin. Code § 162-26-040, and, as under Title III, need not provide an

accommodation that would result in an undue burden or fundamentally alter the nature of the goods or services provided. *Hartleben v. Univ. of Washington*, 194 Wash. App. 877 (2016); *Johnston v. AC JV, LLC*, No. C18-11-MJP, 2018 WL 3769799, at *3 (W.D. Wash. Aug. 9, 2018).

To establish a defendant's duty to provide a reasonable accommodation, a plaintiff must have requested an accommodation due to a disability or prove defendant knew or had reason to know plaintiff had a disability that needed accommodation. *See Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) (once the need for accommodation has been established, there is a mandatory obligation to engage in an informal interactive process). This interactive process is triggered upon notification of the disability and the desire for accommodation. *Id*. However, the ADA does not require an employer to be clairvoyant. S*ee U.S. E.E.O.C. v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1112 (9th Cir. 2010). In *Vinson*, the Ninth Circuit held the provider of public accommodation has the mandatory obligation to engage in an informal interactive process to clarify what the individual needs and identify the appropriate accommodation. *Vinson*, 288 F.3d at 1154 (expressly applying employment case law to claims under Title II of the ADA and section 504 of the Rehabilitation Act). Moreover, the provider's duty to accommodate is a continuing duty that is not exhausted by one effort, if a reasonable accommodation turns out to be ineffective, the provider must consider

whether there would be an alternative reasonable accommodation that would not pose an undue hardship. *See Humphrey v. Memorial Hospitals Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001).

Plaintiff also has a good faith duty—"[t]he interactive process requires communication and good-faith exploration of possible accommodations between [providers] and [recipients], and neither side can delay or obstruct the process." *Id*. (citations omitted).

While Plaintiff frames the discrimination as one of excluding her service dog, Defendants respond that the dog was never excluded. Both parties concede that the only two questions that may be asked concerning allowing a service dog are: (1) whether the animal is required because of a disability, and (2) what work or task is the animal trained to perform? *See* 28 C.F.R. § 36.302(c)(6). Asking these two questions would not get to the heart of the alleged need for an accommodation in this case. Plaintiff presents with a disability that Boomer does not address. Plaintiff's disability for which she seeks accommodation is the inability to hold the leash of her service dog. This type of disability must be expressed to the place of public accommodation in order to receive any relief. *See* 28 C.F.R. § 36.302(c)(4). Plaintiff's contention that she is not required to communicate her need to work Boomer off-leash is rejected. The Ninth Circuit in

*Vinson* requires that the need for an accommodation be communicated, thereby triggering the mandatory informal interactive process. 288 F.3d at 1154.

Plaintiff seeks summary judgment for discrimination based on Defendants' failure to modify its leash policy. *See* ECF No. 66 at 15. Although it is not crystal clear what was said and Plaintiff's deposition testimony could be perceived to contradict some of Plaintiff's later statements, Plaintiff recalled telling her job coaches, Ardyes and Tori Hunter, about her physical disabilities and that she could not physically hold onto Boomer's harness or short leash. In May 2016, Plaintiff told Karen Johnson, the Office's Assistant Project Director, that she had degenerative disc disease and arthritis which prevented her from holding Boomer's leash at all times. In some form, this information was communicated directly to Ms. Moore as evidenced by Ms. Moore's admissions during her deposition testimony: "she had degenerative discs and rheumatoid arthritis" and "Cher[yl] said she had something wrong with her hands." ECF No. 69-4 at 29-30, 69.[2] Yet,

---

[2]     Given Ms. Moore's admissions, the Court declines to strike Plaintiff's declarations that she told three people why she could not hold Boomer's leash, yet earlier in her deposition she seemingly contradicted this by testifying that she did not provide an explanation why she could not hold Boomer's leash.

there is no evidence presented to the Court that the Defendants ever engaged in the

mandatory interactive process.

The Ninth Circuit holds that if an employer receives notice and fails to

engage in the interactive process in good faith, the employer will face liability "*if a*

*reasonable accommodation would have been possible.*"  *Snapp v. United*

*Transportation Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) (emphasis original)

(citing *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir. 2000) (*en banc*),

vacated on other grounds sub nom., *US Airways, Inc. v. Barnett*, 535 U.S. 391, 406

(2002)).  In other words, there exists no stand-alone claim for failing to engage in

the interactive process.  *Id*.  Rather, discrimination results from denying an

available and reasonable accommodation.  *Id*.

Thus, according to the Ninth Circuit, the failure to engage in the interactive

process often prevents summary judgment for the defense:

> Recognizing the importance of the interactive process, the Ninth
> Circuit also held that if an employer fails to engage in good faith in
> the interactive process, the burden at the summary-judgment phase
> shifts to the employer to prove the unavailability of a reasonable
> accommodation.  *See Morton v. United Parcel Serv., Inc.*, 272 F.3d
> 1249, 1256 (9th Cir. 2001), *overruled on other grounds*, *Bates v.*
> *United Parcel Serv., Inc.*, 511 F.3d 974, 995 (9th Cir. 2007) (*en*
> *banc*); *Barnett*, 228 F.3d at 1116 ("We hold that employers, who fail
> to engage in the interactive process in good faith, face liability for the
> remedies imposed by the statute if a reasonable accommodation
> would have been possible.  We further hold that an employer cannot
> prevail at the summary judgment stage if there is a genuine dispute as
> to whether the employer engaged in good faith in the interactive
> process.").  The rationale for shifting this burden arises from EEOC

regulations and the ADA's legislative history that characterize the interactive process as at the heart of the accommodation process. *See Barnett*, 228 F.3d at 1110–16.

*Snapp*, 889 F.3d at 1095.

The Court finds there are genuine issues of material fact preventing summary judgment for either party. These issues include (1) whether Defendants were adequately put on notice that Plaintiff needed a no-leash accommodation because of her disability; (2) whether modification of the leash policy would be reasonable (or otherwise pose a significant risk to the health or safety of others) under the circumstances; and (3) whether any other accommodation was reasonable (i.e., whether Plaintiff could have complied with the leash policy by using a longer leash, rather than the shorter, restrictive, leash that forced Plaintiff to lean over to hold), but not offered. Defendants argue Plaintiff could have used a longer leash and avoided the discomfort caused by holding onto Boomer with a short leash. Despite that there is no evidence that a longer leash option was offered to Plaintiff, she argues that using a longer leash would create a hazard for her and also mentioned that it is difficult to hold even a pen on some days. ECF Nos. 78-1 at 21, 23-26; 67 at 12-13, ¶ 47.

Plaintiff also seeks summary judgment for discrimination based on AARP Foundation's failure to allow Plaintiff to attend the IEP meetings via phone. *See* ECF No. 66 at 15. However, Plaintiff did not explain the basis for her first request

to attend the IEP meeting via phone and Plaintiff has not presented evidence she did so the second time. As such, Plaintiff is not entitled to summary judgment for the failure to allow Plaintiff to attend the IEP meetings via phone. Defendants are entitled to summary judgment on this claim of failure to accommodate.

Finally, Plaintiff argues Defendant Ms. Moore is personally liable as an "operator" of the program. ECF No. 66 at 17. Title III of the ADA prohibits discrimination "by any person who . . . operates a place of public accommodation." 42 U.S.C. § 12182(a). "'[T]o operate' means 'to put or keep in operation,' 'to control or direct the functioning of,' or 'to conduct the affairs of; manage.'" *Lentini v. Cal. Ctr. For the Arts, Escondido*, 370 F.3d 837, 849 (9th Cir. 2004). Indeed, the Ninth Circuit in *Lentini* found the director of sales and event services "had the requisite authority to qualify as an 'operator' under Title III [because] he was in a position of authority, having the ability to instruct the [] staff on who could or could not be admitted to the theater." *Id.*

Defendants argue *Lentini* is distinguishable because that case dealt with the exclusion of the plaintiff's service animal. ECF No. 77 at 9-10. However, the Court in *Lentini* did not couch its holding in such terms and, in any event, having a policy that has the practical effect of excluding a service animal is tantamount to direct exclusion. Given Ms. Moore was clearly in charge of the operations for the SCSEP program at the AARP Foundation office and because Ms. Moore was the

directing force behind all of the alleged discriminatory acts, including forming and enforcing the leash policy, the Court finds Ms. Moore was an "operator" of the SCSEP program at AARP Foundation. Ms. Moore also qualifies as a manager or agent of AARP Foundation subject to liability for her actions under RCW 49.60.040(19).

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Defendants AARP Inc., AARP Foundation, and Sandra Moore's Motion for Summary Judgment (ECF No. 32) is **granted in part**:

   a. Defendant AARP Inc. is **DISMISSED**.

   b. Plaintiff's Intentional Infliction of Emotional Distress claim is **DISMISSED**.

   c. Plaintiff's Title I of the ADA claim is **DISMISSED**.

   d. Plaintiff's claim of discrimination for not allowing attendance of the IEP meetings by telephone is **DISMISSED**.

2. Plaintiff Cheryl Olson's Motion for Partial Summary Judgment (ECF No. 66) is **granted in part**.

   a. Defendant AARP Foundation's administration of the SCSEP constitutes an entity providing public accommodation and is thus subject to liability under Title III of the ADA and the WLAD. It

also receives federal financial assistance and thus is subject to
liability under Section 504 of the Rehabilitation Act.

  b. Defendant Sandra Moore was an "operator" of the SCSEP program
     at AARP Foundation and is thereby subject to liability under Title
     III of the ADA and the WLAD.

  c. Plaintiff is a person with a disability and Boomer is her service
     animal assisting her with some of those disabilities.

The District Court Executive is hereby directed to enter this Order, terminate

AARP, Inc., from the action, and provide copies to counsel.

**DATED** May 2, 2019.



                    THOMAS O. RICE
              Chief United States District Judge